| | |
|---|---|
| **2nd Judicial District Court**<br>**Denver County, State of Colorado**<br>Court Address:   1437 Bannock Street<br>                             Denver, CO 80202<br><br>**Plaintiff:**   Anthony B. Lobato & Clare M. Lobato<br><br>**v.**<br><br>**Defendant:** Travelers Property Casualty Company of America | DATE FILED: January 23, 2018 10:51 AM<br>FILING ID: 346B9B69CDFC7<br>CASE NUMBER: 2018CV30253<br><br><br><br>▲   COURT USE ONLY   ▲ |
| **Attorney for Plaintiffs:**<br>Attorney:     Andrew M. Newcomb, #37032<br>                   David Roth, #44800<br>                   Samuel F. Mitchell, #51253<br>Address:     Speights and Worrich, LLC<br>                   116 Inverness Drive East, Suite 270<br>                   Englewood, CO 80112<br>Phone Num.: (303) 662-8082<br>FAX Num.:   (303) 662-8083<br>E-Mail:        Andrew@speightsfirm.com<br>                   David@speightsfirm.com<br>                   Sam@speightsfirm.com | Case Number:<br><br>Div.: |
| **COMPLAINT AND JURY DEMAND** | |

COME NOW PLAINTIFFS, Anthony B. Lobato and Clare M. Lobato, by and through their attorneys, Speights and Worrich, LLC, and file this Complaint against the above-named Defendant as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiffs Anthony B. Lobato and Clare M. Lobato are citizens of the State of Colorado residing at 15769 West 95th Place, Arvada, Colorado 80007.

2. Defendant Travelers Property Casualty Company of America is a foreign corporation doing business in the state of Colorado, with its principal place of business in Hartford, Connecticut, and is authorized to do business in Colorado. Defendant may be served with process at the Colorado Division of Insurance, 1560 Broadway, Denver, Colorado 80202.

3. This Court has jurisdiction over the subject matter of this action and the parties hereto.

4. Venue is proper in this Court pursuant to C.R.C.P. 98(c)(1)

## **GENERAL ALLEGATIONS**

5. At all times relevant to this action, Anthony B. Lobato and Clare M. Lobato (hereinafter "Plaintiffs") were insured by Travelers Property Casualty Company of America (hereinafter "Defendant") under a policy of automobile insurance, including underinsured motorist insurance pursuant to C.R.S. §10-4-609(4), with a policy number of BA-9E80954A-14-CNS.

6. On January 10, 2015, Plaintiffs were involved in a motor-vehicle collision and suffered severe bodily injuries when a truck operated by tortfeasor Adam Andes ("Mr. Andes") negligently crossed into the oncoming traffic lane and struck the Plaintiffs' vehicle head-on. At the time of the collision, each vehicle was traveling at approximately forty (40) miles per hour.

7. As a result of this violent high-speed collision, both vehicles suffered major property damage. The cabin of Plaintiffs' vehicle was significantly impinged, pinning both Plaintiffs into the vehicle. Both vehicles were emitting smoke and fumes, and the emergency first-responders had to use the "jaws-of-life" to extricate Plaintiffs from their vehicle. An initial responding police officer on the scene, Officer Kirk Jones, observed that Mrs. Lobato was "screaming in pain" in the vehicle.

8. Upon extrication, Plaintiffs were transferred by ambulance to Good Samaritan hospital in Boulder, Colorado, where Mrs. Lobato was classified as a "serious bodily injury" [1] victim. Mrs. Lobato sustained grievous physical and psychological injuries as a result of the collision, including but not limited to, complex fractures of the bones in each foot and a tear of her left anterior cruciate ligament ("ACL"). Mr. Lobato likewise suffered serious physical and psychological injury as a result of the collision, including but not limited to a comminuted fracture of the navicular in his left foot. Each of the Plaintiffs' serious traumatic injuries required one or more surgical repairs, and caused Mrs. Lobato to be wheelchair-bound for an extended period of time. Further, the Plaintiffs' injuries required follow-up surgical procedures over the subsequent year and a half.

9. As a direct and proximate result of Mr. Andes' negligence and carelessness, Plaintiffs have incurred past medical charges in excess of $134,847.78, and will continue to incur additional medical charges in the future as a result of necessary future medical treatment.

10. As a direct and proximate result of Mr. Andes' negligence and carelessness, Plaintiffs have sustained permanent physical impairment.

---

[1] Serious Bodily Injury- bodily injury which, either at the time of the actual injury or at a later time, involves a substantial risk of death, a substantial risk of serious permanent disfigurement, a substantial risk of protracted loss or impairment of the function of any part or organ of the body, or breaks, fractures, or burns of the second or third degree. C.R.S. 18-1-901 (3)(p).

11. As a direct and proximate result of Mr. Andes' negligence and carelessness, Plaintiffs have sustained and will sustain future loss of earnings and earning capacity.

12. On February 26, 2016, Plaintiff Clare Lobato made a demand to State Farm, the liability carrier for tortfeasor Mr. Andes, in the amount of $2,000,000,00, based on the permanent and severe nature of her injuries, which were evident and obvious at the time of the demand. In response to her demand, on or about April 13, 2016, State Farm offered its full policy limit of $50,000.00 in settlement of Clare Lobato's claim against Mr. Andes arising out of the collision.

13. On January 11, 2016, Plaintiff Anthony Lobato made a demand to State Farm, the liability carrier for tortfeasor Mr. Andes, in the amount of $550,000.00, based on the permanent and severe nature of his injuries, which were evident and obvious at the time of the demand. In response to his demand, on or about March 8, 2016, State Farm offered its full policy limit of $50,000.00 in settlement of Anthony Lobato's claim against Mr. Andes arising out of the collision.

14. In approximately May 2016, Counsel for Plaintiffs made a request in writing to Defendant asking that Defendant provide its permission to settle each of Plaintiffs' claims against the tortfeasor for the policy limits. Defendant timely provided permission to settle each Plaintiff's claim.

15. On June 15, 2016, Plaintiffs subsequently made a demand against Defendant on behalf of Plaintiff Clare Lobato for the policy limit of $1,000,000.00, and on behalf of Plaintiff Anthony Lobato for $350,000.00. Plaintiffs stated with particularity every aspect of the motor vehicle collision, the extent and permanent nature of the Plaintiffs' injuries, subsequent treatments, future prognoses, and future damages for each.

16. On August 2, 2016, **forty-eight (48) days** after the initial demand, Defendant sent an email to Plaintiffs' counsel indicating that upon "consultation [] with counsel who has discussed with me his jury research for 2015 and 2016…. Based on jury verdict research, pain and suffering has been awarded in an amount similar to total economic damages." In this email, Defendant advised that its evaluation of Mr. Lobato's claim was $25,000.00, and its evaluation of Mrs. Lobato's claim was $320,085.00. Defendant did not include its "jury verdict research" for the Plaintiffs' review, and did not include pre-judgment interest as a category of damages in its evaluation.

17. On September 8, 2016, Plaintiffs responded to Defendant's offer disputing its evaluation of each claim and asking specific questions to the Defendant about its evaluation. Plaintiffs asked for specific information on the cases that had been identified in its research. In response, on September 20, 2016, Defendant provided a list of Jury Verdict Reporter Volumes, Counties and dates *only*, without

identifying the details of each case or any specific analysis of each case. Counsel for Plaintiffs spent significant time and resources to retrieve each case from the vague information provided by Defendant, and review each for comparison. The identified cases provided by Defendant varied across the spectrum of relevance to the Plaintiffs' case.

18. On September 20, 2016, Defendant responded to Plaintiffs and stated that the claim had been "properly evaluated."

19. On November 30, 2016, Defendant reversed its prior position that it was not required to compensate Plaintiffs for pre-judgment interest as part of its claim evaluation, and paid Mrs. Lobato $56,097.00 and Mr. Lobato $5,175.00, respectively. This payment was made **one-hundred and sixty-one (161) days** after Plaintiffs' initial demand for policy limits.

20. In an effort to require the Defendant to perform its legal duty to conduct a reasonable and complete evaluation of their claims, Plaintiffs were then required to retain a life-care planner, Helen Woodard, M.A., of Reentry Rehabilitation Services, Inc. ("Woodard"), to provide a plan for each and further underscore the serious and permanent nature of their injuries. Plaintiffs also retained an economist, Jeffrey B. Opp, ("Opp") to reduce the cost of the life care plans to a discrete dollar amount. Woodard created her reports on July 26, 2017. Plaintiffs incurred substantial costs in retaining these experts.

21. The reports were provided to Defendant on July 27, 2017 and August 11, 2017, respectively. On September 26, 2017, Defendant, *for the first time*, requested that the Plaintiffs each submit to a C.R.C.P. 35 medico-legal examination with Kevin Nagamani, M.D. Defendant's request for medico-legal examinations came **seventy (70) days** after receiving Plaintiffs' expert reports, and approximately **thirteen (13) months** after Plaintiffs' initial demand.

22. On September 29, 2017, in response to Defendant's medico-legal examination request, Plaintiffs advised Defendant that the claim had been in adjustment for an extended time period, and asked Travelers' to identify any additional steps it would require to complete its evaluation. Plaintiffs further suggested that it would be more expedient to retain an economist or CPA to evaluate the cost of Plaintiffs' life care plans if it was not questioning causation. Defendant declined to take this path.

23. Mr. Opp opined that Mr. Lobato's quantifiable losses fell within a range between $234,140.00 and $806,657.00. Mr. Opp opined that Mrs. Lobato's quantifiable losses fell within a range between $600,839.00 and $1,080,966.00, each as a direct and proximate result of the collision. Rather than rely on the reports provided by the Plaintiffs, or arrange a request to interview the Plaintiffs or their experts, Defendant retained an expert to counter Mr. Opp and Ms. Woodard's reports.

24. On November 14, 2017 Defendant informed Plaintiffs **for the first time** that it had retained the services of Greg Taylor, CPA, of Jacobson & Associates, P.C. ("Taylor") to critique Plaintiffs' expert reports. Upon information and belief, Mr. Taylor lacks the requisite training and experience to offer expert opinion regarding the substance of Ms. Woodard's life care plan. Defendant unreasonably sought the opinion of an accountant to rebut an expert in an entirely different field, despite Plaintiffs' suggestion that it retain a life care planner to accurately compare reports.

25. Mr. Taylor did not interview Mr. or Mrs. Lobato, did not interview their treating orthopedic surgeon or other treating physicians, and did not interview any of Mr. or Mrs. Lobato's work supervisors in creating his reports.

26. On November 21, 2017, Defendant provided Mr. Taylor's reports to Plaintiffs along with a payment of "additional amounts" of damages to Mrs. Lobato in the amount of $76,021.64, and to Mr. Lobato in the amount of $175,175.33. Defendant did not issue payment for pre-judgment interest associated with its calculated additional payments.

27. These "additional payments" were unreasonably delayed for a minimum of **102 days**, which equals the date from Plaintiffs' provision of its expert reports (August 11, 2017) through the date of partial payment (November 21, 2017).

28. Defendant did not retain its own life care planner to rebut the Plaintiffs' expert. Instead, it relied on Mr. Taylor, a Certified Public Accountant, to critique Ms. Woodard's expert opinion.

29. Mr. Taylor was able, without speaking with the Plaintiffs, their doctors, or their experts, to opine that the Plaintiffs' damages were significantly lower than reported in their expert reports, and were even created by their own conduct. To wit, Mr. Taylor offered that, "[i]n our opinion, Ms. (sic) Lobato created her own losses by leaving CSL even through her employer was accommodating her and she had a management position that would allow her to likely work around any issues that she might have had."

30. Mr. Taylor opined that Mrs. Lobato's future medical expenses fell within a range of $21,202.00 and $52,100.00, and that her past lost wages were $3,800.00. These numbers were substantially lower than those cited in Mr. Opp's report.

31. Mr. Taylor opined that Mr. Lobato's future medical expenses fell within a range of $36,471.00 and $113,068.00. These calculations were substantially lower than those cited in Mr. Opp's report.

32. Upon information and belief, Defendant made no inquiry into the discrepancies between Plaintiffs and Defendant's expert reports and accepted Mr. Taylor's

calculations on their face. Defendant's decision to evaluate the Plaintiffs' claims without once seeking to speak to the Plaintiffs or their various experts was unreasonable, willful, wanton, and with deliberate indifference to the well-being of its insureds.

33. Defendant's failure to evaluate Plaintiffs' claim from its inception reasonably or in good faith and fair dealing, and subsequent delay in the payment of Plaintiffs' claims are the direct and proximate cause of the Plaintiffs' damages.

34. This information was provided to Defendant on June 15, 2016, when the Plaintiffs made a demand for UIM policy limits. Other than routine follow-up medical visits, the Plaintiffs did not undergo major medical procedures after the date of the initial demand on June 15, 2016.

35. Dr. Nagamani was instructed by Defendant not to prepare a written report. While it is not known at this time why such an instruction was given, common sense and reasonable inference presume that Dr. Nagamani's opinion was materially similar to the opinions of Plaintiffs' treating orthopedist, Dr. Koldenhoven.

36. However, in his formulation of life-care estimates for Mr. and Mrs. Lobato, Mr. Taylor indicated that "based on discussions with Dr. Kevin Nagamani" they were able to calculate the reasonable amount necessary for life-care plans.

37. The notes and/or context of those discussions have not been provided to Plaintiffs.

38. Finally, on December 5, 2017, Defendant retained Daniel Murphy, Esq., of Murphy & Decker, P.C. Mr. Murphy provided a letter to Plaintiffs on December 5, asserting that the Plaintiffs had been "fully and fairly" compensated by Defendant in its evaluation and payment of the claim.

39. Plaintiffs were the victims of a catastrophic automobile accident on January 10, 2015, in which they were left helpless in a truck that was severely damaged and required extrication by the "jaws of life."

40. Plaintiffs at the time of the collision were in a vehicle with a $1 million dollar policy limit for underinsured motorists.

41. Plaintiffs purchased this policy for the peace of mind and security that if such a collision as in the instant action were to occur, they would be protected.

42. Plaintiffs dispute the Defendant's evaluation of their damages, and maintain that their damages far exceed the policy limit of $1,000,000.00, as they originally averred in their June 16, 2016 demand. As of the date of filing the instant action, Defendant has paid out a total of $678,464.95. Plaintiffs bring an action in breach of contract to collect the remainder of the policy limit, or $321,535.10.

43. Defendant unreasonably delayed payment of the Plaintiffs' claims on at least two separate occasions, causing them significant financial hardship. Further, the Defendant's conduct in going to great lengths to avoid payment of its full policy limit despite obvious evidence supporting such payment constitutes willful, wanton, and reckless behavior with deliberate indifference for their well-being.

## PLAINTIFFS' FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT

44. Plaintiffs incorporate all previous allegations as if more fully set forth herein.

45. At the time of the aforementioned collision, Plaintiffs were covered by a policy of insurance issued by Defendant.

46. The subject policy of insurance included uninsured/underinsured motorist ("UIM") coverage, which provided that Defendant will pay for damages and bodily injuries sustained by Plaintiffs in the case of injury by a negligent underinsured motorist.

47. Plaintiffs are entitled to economic damages due to the breach of contract. Further, the Plaintiffs are entitled to non-economic damages. Serious non-economic harm is foreseeable when the contract is of a more personal nature. *Giampapa v. American Family Mut. Ins. Co.*, 64 P.3d 230, 238 (Colo. 2003). For instance, when an insured pays for automobile insurance, not only is the insured paying for coverage in the event of an accident but they also are paying for the peace of mind and security that inherently accompanies that insurance coverage. *Id.*

48. Thus, it is entirely foreseeable at the time of contracting that if the insurer later decides to intentionally and wrongfully abandon its agreement after the insured is seriously injured in a debilitating automobile accident, physical pain and mental anguish will be the probable results of the breach. *Id.*

49. Defendant has failed to provide Plaintiffs with the full Underinsured Motorist contractual protections as outlined in the policy.

50. Defendant's failure to provide full benefits under the policy constitutes a breach of contract.

51. As a direct and proximate cause of Defendant's breach of contract, Plaintiffs have and continue to incur damages to be proved at trial.

## PLAINTIFFS' SECOND CLAIM FOR RELIEF

## BAD FAITH BREACH OF INSURANCE CONTRACT

52. Plaintiffs incorporate all previous allegations as if more fully set forth herein.

53. As an insurance provider, Defendant at all times, has the affirmative duty to act in good faith and faith dealing when evaluating and handling the claims of their insured; to abstain from deceptive and/or misleading practices and to keep, observe, and practice the principles of law and equity in all matters pertaining to the business of insurance.

54. Under Colorado law, every insurance contract contains an implied covenant of good faith and fair dealing and imposes on insurers a duty to act in good faith with its insureds. Pursuant to its implied duty of good faith and fair dealing, Defendant owed Plaintiffs' an obligation to treat their interests with equal consideration to its own interests.

55. Defendant has breached its duty of good faith and fair dealing owed to Plaintiffs.

56. Defendant's aforesaid behavior was unreasonable and Defendant knew such conduct to be the same or recklessly disregarded the willful and wrongful behavior.

57. Thus as a direct and proximate cause, Defendant's beach of its affirmative duty of good faith and fair dealing, Plaintiffs' have and continue to sustain damages in the amount proved at trial.

58. Defendant committed unfair or deceptive acts or practices, breaching its duty of good faith and fair dealing owed to Plaintiffs, as outlined within C.R.S. §10-3-1103 and C.R.S. §10-3-1104, including but not limited to:

    a) Failing to give equal consideration to the interest of Plaintiffs, its insureds;
    b) When investigating Plaintiffs' claims, failing to diligently search for evidence that supported their insured's (Plaintiffs') claims;
    c) Seeking to discover only evidence that defeated their insured's (Plaintiffs') claims;
    d) Unreasonably delaying and/or withholding benefits under the insurance policy without a reasonable basis for delaying and/or withholding benefits, with knowledge or reckless disregard of a lack or reasonable basis for delaying and/or withholding benefits;
    e) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under the insurance policy;
    f) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
    g) Not attempting in good faith to effectuate prompt, fair and equitable settlements for claims after its liability has become reasonably clear;
    h) Compelling Plaintiffs to institute litigation to recover amounts due under the insurance policy by offering substantially less than the amounts Plaintiffs are entitled to recover;

     i) Forcing Plaintiffs into the costly and lengthy process of litigation;

     j) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printing advertising material accompanying or made part of an application;

     k) Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;

     l) Any further acts which may be discovered.

## PLAINTIFF'S THIRD CLAIM FOR RELIEF

### UNREASONABLE DELAY OF PAYMENT OF COVERED BENEFITS PURSUANT TO C.R.S. §§ 10-3-1115 AND 10-3-1116

59. Plaintiffs incorporate all previous allegations as if more fully set forth herein.

60. Plaintiffs are "first-party claimants" as that term is defined in C.R.S. § 10-3-1115 (1)(b).

61. Defendant is a "person engaged in the business of insurance," as that term is used in C.R.S. § 10-3-1115.

62. Pursuant to C.R.S. § 10-3-1115, Defendant shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of Plaintiffs.

63. Defendant unreasonably denied and delayed payments of benefits owed to or on behalf of Plaintiffs.

64. As a direct and proximate result of Defendant's unreasonable delay of Plaintiffs' claims, Plaintiffs are entitled to reasonable attorney's fees, court costs and two times the covered benefits pursuant to C.R.S. §10-3-1116.

    WHEREFORE, Plaintiffs respectfully request a judgment against the Defendant, for damages they are legally entitled to collect from the Defendant, including but not limited to:

1. Damages as a result of Defendant's breach of contract and bad faith breach of insurance contract;

2. Costs of this action, including expert witness fees;

3. Reasonable attorney's fees and two times the covered benefits provided by the insurance policies with Defendant pursuant to C.R.S. §10-3-1115 and C.R.S. §10-3-1116.

4. Special damages;

5. Interest as provided by law; and

6. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by Jury.

Respectfully submitted this 23rd day of January, 2018.

Respectfully Submitted,

/s/ Andrew M. Newcomb
Andrew M. Newcomb, #37032
Attorney for Plaintiff

In accordance with C.R.C.P. 121, §1-26(9), a printed copy of this document with original signatures is being maintained by the filing party and will be made available for inspection by other parties or the Court upon request.