## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-00504-REB-MEH


ANTHONY B. LOBATO and CLARE M. LOBATO,

      Plaintiffs,

v

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,

      Defendant.

---

### PLAINTIFFS' EXPERT DISCLOSURES PURSUANT TO FRCP 26(a)(2)

---

COME NOW PLAINTIFFS, Anthony B. Lobato and Clare M. Lobato, by and through their attorneys, Speights & Worrich, LLC, and pursuant to FRCP 26(a)(2), hereby submit their Expert Disclosures as follows:

*Plaintiffs reserve the right to endorse any expert witness endorsed by the Defense, including the contents of the disclosure, written reports, and any deposition or other sworn testimony.*

### I.    Rule 26(a)(2)(B) Experts (Retained or Specially Employed)

    1.    Elliott S. Flood

If called, Elliott S. Flood will provide expert testimony at trial consistent with the contents of his report, and deposition testimony, if any. He will also review additional documents and depositions as they are made available during the discovery of this case, which may generate additional expert opinion testimony. He may be called in Plaintiffs' case-in-chief, rebuttal, or both.

      **A.    STATEMENT OF ALL OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:** *See* the Elliott S. Flood report dated November 16, 2018 (Lobato Expert 001-073).

Exhibit 1

**B.   LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:**   *See* the Elliott S. Flood report dated November 16, 2018 (Lobato Expert 001-073).

**C.   EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:**   *See* the Elliott S. Flood report dated November 16, 2018 (Lobato Expert 001-073).   Plaintiffs intend to use all exhibits listed or referenced in his report as well as any exhibits relied upon by Defendants in direct, cross-examination, and/or rebuttal.

**D.   THE QUALIFICATIONS OF THE WITNESS:**   Please see Mr. Flood's Curriculum Vitae attached as Lobato Expert 018.

**E.   THE COMPENSATION FOR THE STUDY AND TESTIMONY:**   Please see the compensation Fee Schedule attached as Lobato Expert 074.

**F.   A LIST OF ANY OTHER CASES IN WHICH THE WITNESS HAS TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION WITHIN THE PRECEDING FOUR YEARS:**   Please see Testimony list attached as Lobato Expert 019-036.

2.   Helen M. Woodard, M.A.
Laura Woodard, M.A.
ReEntry Rehabilitation Services, Inc.

If called, Helen M. Woodard will provide expert testimony at trial consistent with the contents of her report, and deposition testimony, if any.   She will also review additional documents and depositions, as they are made available during the discovery of this case, which may generate additional expert opinion testimony.   She may be called on Plaintiffs' case-in-chief, rebuttal, or both.

**A.   STATEMENT OF ALL OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:**   *See* the report for Anthony Lobato dated July 26, 2017 (Lobato, A 150-171*). See* the report for Clare Lobato dated July 6, 2017 (Lobato, C 690-706).

**B.   LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:**   *See* the report for Anthony Lobato dated July 26, 2017 (Lobato, A 150-171*). See* the report for Clare Lobato dated July 6, 2017 (Lobato, C 690-706).

**C.   EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:**   *See* the report for Anthony Lobato dated July 26, 2017

(Lobato, A 150-171). *See* the report for Clare Lobato dated July 6, 2017 (Lobato, C 690-706).  Plaintiffs intend to use all exhibits listed in the report as well.

**D.     THE QUALIFICATIONS OF THE WITNESS:**  Please see Curriculum Vitae of Helen Woodard attached as Lobato Expert 075-077 and Laura Woodard attached as Lobato Expert 078-079.

**E.     THE COMPENSATION FOR THE STUDY AND TESTIMONY:**  Please see the compensation Fee Schedule attached as Lobato Expert 080.

**F.     A LIST OF ANY OTHER CASES IN WHICH THE WITNESS HAS TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION WITH THE PRECEDING FOUR YEARS:**  Please see Testimony list of Helen Woodard attached as Lobato Expert 081-099 and Laura Woodard attached as Lobato Expert 100-106.

3.     Jeffrey B. Opp

If called, Jeffrey B. Opp will provide expert testimony at trial consistent with the contents of his report, and deposition testimony, if any.  He will also review additional documents and depositions, as they are made available during the discovery of this case, which may generate additional expert opinion testimony. He may be called on Plaintiffs' case-in-chief, rebuttal, or both.

**A.     STATEMENT OF ALL OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:**  *See* the report for Clare Lobato dated July 21, 2017 (Lobato, C 707-721) and the report for Anthony Lobato dated August 9, 2017 (Lobato, A 172-188).

**B.     LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:**  *See* the report for Clare Lobato dated July 21, 2017 (Lobato, C 707-721) and the report for Anthony Lobato dated August 9, 2017 (Lobato, A 172-188).

**C.     EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:**  *See* the report for Clare Lobato dated July 21, 2017 (Lobato, C 707-721) and the report for Anthony Lobato dated August 9, 2017 (Lobato, A 172-188).   Plaintiffs intend to use all exhibits listed in the report as well.

**D.     THE QUALIFICATIONS OF THE WITNESS:**  Please see Curriculum Vitae attached as Lobato Expert 107-118.

**E.     THE COMPENSATION FOR THE STUDY AND TESTIMONY:**  Please see the compensation Fee Schedule attached as Lobato Expert 107-118.

**F.     A LIST OF ANY OTHER CASES IN WHICH THE WITNESS HAS TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION WITH THE PRECEDING FOUR YEARS:**  Please see Testimony list attached as Lobato Expert 107-118.

## II.     Rule 26(a)(2)(C) Experts (Healthcare Providers or Examiners)

4.     Kevin K. Nagamani, M.D.

If called, Dr. Nagamani will provide expert testimony at trial consistent with his deposition testimony.  He may also review additional documents and depositions as they are made available during the discovery of this case, which may generate additional expert opinion testimony.  He may be called in Plaintiffs' case-in-chief, rebuttal, or both. If called, he will testify consistent with his knowledge of Plaintiffs' medical history, the reasonableness and necessity of treatment, causation and other opinions relating thereto.   In addition, Dr. Nagamani is expected to testify consistently with his prior deposition testimony.

**A.     STATEMENT OF ALL OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:**  *See* deposition transcript dated September 21, 2018 (Lobato Expert 119-316); namely:

Q.     *(By Mr. Newcomb) Okay. Again, just to try to move it along.*

A.     *Yes.*

Q.     *If there's no medical history of a knee injury in Ms. Lobato's file prior to this accident --*

A.     *Yes*

Q.     *--and it was discovered after she had been taken out of, essentially, I guess, leg casts --*

A.     *Uh-huh.*

Q.     *--from her foot injuries, would you believe that that knee injury is related to the collision?*

        *MR. STEPHENSON: Object to form and foundation.*

A.     *Yeah, I think that would be a reasonable conclusion.*

Q.     *(By Mr. Newcomb)  Okay.  And all I'm trying to get at -- because I'm just sort of learning this as we sit here -- is, it doesn't appear that you were engaged to really opine as to causation in the past -- for the past injuries, right?*

        *MR. STEPHENSON: Object to form and foundation.*

A.     *That's -- that was my understanding.*

*Q. (By Mr. Newcomb) Okay. But then you did mention that they were asking questions about, really, prognosis, right?*

> *MR. STEPHENSON: Object to form and foundation.*

*A.     Yes.*

*Q. (By Mr. Newcomb) Okay. And did you have any objections that you recall today about Ms. Lobato's prognosis, either from the medical records or the life care plan?*

*MR. STEPHENSON: Object to form and foundation.*

*A.     I -- I'd have to review it again to -- to see very specifically.  In terms of -- I think the -- I think there was more, like, small specifics in and about the life care plan that maybe I had given the opinion of:*

*Well, I think this may be a little bit excessive in terms of how much disability is being proposed.*

*But I think as a skeleton plan, I mean, you know, I did agree or -- yes, there would be some disability and -- and future effects and possible need for future care related to this.*

*Q.     (By Mr. Newcomb)  And let me ask you that about -- with respect to Clare.*

*Do you believe that her -- her --you've -- you've reviewed the medical records at some point, correct?*

*A.     Yes.*

*Q.     You're aware that she had -- of the*

*injuries to her feet and knee, correct?*

*A.     Yes.*

*Q.     Those are permanent injuries, correct?*

*MR. STEPHENSON:  Object to form and*

*foundation.*

*A.     Permanent -- I don't understand the question.  Permanent in --*

*Q.     (By Mr. Newcomb)  You're a medical doctor?*

*A.     Yes.*

*Q.     You are workers' compensated --*

*A.     Yes.*

*Q.     --compensation Level II --*

*A.     Yes*

*Q.     --Accredited?          You actually do a permanency --*

*A.     Yes.*

*Q.     -- very specifically?  You understand what permanent --*

*A.     Oh, you're talking about permanent impairment is attributable to the injuries?*

*Q.     Do you believe that Ms. Lobato's -- any of her injuries are permanent in nature?*

     *MR. STEPHENSON:  Object to form and foundation.*

*A.     You know, I'm sorry.  So I -- I don't look -- I look at it, is there a permanent impairment related to it?  Then I would say yes.*

*Q.     (By Mr. Newcomb) Okay.*

*A.     Permanent injuries, meaning she had surgery for an ACL or ACL was fixed, I don't know if I would consider that a permanent injury, I mean, in terms of permanent, in terms of, you know -- you know, once it's fixed, its -- you know, is there -- their injury is not the same anymore as what it was.*

     *Is there some possibility for some residual issues related to the fact that they had the injury?   Yes.  I mean, is that -- I don't know if I would call that "permanent injury," but there's possible of sequelae and effects from previous injuries that they may experience later in life.  But --in that sense, yes.*

*Q.     So - I understand what you're saying.  The knee, even with an ACL repair, is not the same knee that Ms. Lobato had prior to the collision; is that correct?*

     *MR. STEPHENSON:  Object to form and foundation.*

*A.     Yes.*

*Q.     (By Mr. Newcomb)  Okay.  Similarly, with Ms. Lobato's feet, are the -- would you consider those permanent injuries?*

     *MR. STEPHENSON:  Object to form and foundation.*

*A.     You know, I think with the severity of her injury -- you know, I -- I'm sorry. I am not trying to be -- I just never referred to the -- think of it in those terms.  But in terms of -- because I kind of think of it:  Okay, you have this injury, what are your residual effects, as opposed to a black-and-white permanent injury.*

Q.      (By Mr. Newcomb) Okay.

A.      Like, to me, a permanent injury is that someone's leg got -- got crushed and had to have an amputation or something like that.

Q.      Okay.

A.      So I think it's just more in terms of my conceptualizing what you'll say -- what you're saying.  I think that, yes, the injuries are of the severity that permanent -- some permanent effects from them are to be expected, yet.

Q.      All right.  She has been recommended for potential fusion in at least one of her feet.

A.      Yes.

Q.      Do you recall that?

A.      Yes.

Q.      All right.  The -- do you think that's an unreasonable diagnosis --

        MR. STEPHENSON:  Object --

Q.      (By Mr. Newcomb) -- or prognosis, rather?

        MR. STEPHENSON:  Object to form and foundation.

A.      Yeah.  It's -- with a -- and I think specifically on the side with the Lisfranc injury, a certain percentage of patients with that injury, not all, but some end up needing to have fusion in the future as a result of arthritis related to the injury.

Q.      (By Mr. Newcomb)  Do you believe, though -- and you were asked about this, I believe -- that -- that that fusion is unreasonable in Ms. Lobato's case?

        MR. STEPHENSON:  Object to form and foundation.

A.      Not -- no, not that it's unreasonable, but that it's not always necessary after this injury.  It's not an inevitability after the injury, that some patients end up needing to get -- get this fusion done after such an injury and some don't.

Q.      (By Mr. Newcomb)  Did you tell any -- anyone on that call that the possibility of a future foot -- fusion in the foot was unreasonable or unlikely?

        MR. STEPHENSON:  Object to form or foundation.

A.      I don't recall --

        MR. STEPHENSON:  And foundation, I should say.

The Witness:  Oh.

MR. STEPHENSON:  Go ahead.

The Witness:  All right.

A.      I don't recall saying anything like that.  I -- I typically -- I mean, my opinion for a Lisfranc injury is, there is a possibility for the need of fusion in -- but not inevitable need, but possible need for fusion in the future.

Q.      (By Mr. Newcomb)  Okay.  Do you have an opinion about the nature and severity of Ms. Lobato's injuries --

        MR. STEPHENSON:  Object to form--

Q.      (By Mr. Newcomb) -- as you --

        MR. STEPHENSON:  and foundation.

Q.      (By Mr. Newcomb) -- sit here today?

        MR. STEPHENSON:  Object to form and foundation.

A.      Very -- well, it's a very general question.  I mean, I think that it's -- you know, yes, they're -- they're significant injuries that -- you know, generally, you know, a crushing injury to the foot, you have some residual pain, some residual functional problems with it that highly varies from patient to patient.  Some have a lot, some have a little, and it's hard to really pinpoint a concrete prognosis from patient to patient.

        A Lisfranc injury, like we've talked about, there is some prognosis for arthritis developing as time passes and possible need for injections or surgery in the future.

Q.      (By Mr. Newcomb)  All right.  With respect to Mr. Lobato -- we've been talking about Clare --

A.      Uh-huh.

Q.      -- do -- and I asked the question earlier, and I want to make sure I'm clear.  You -- you weren't really questioning or opining that the causation of his injury was not related to the collision, right?

        MR. STEPHENSON:  Object to form and foundation.

A.      No.

Q.      (By Mr. Newcomb)  Okay.  Did you have any criticisms about any of the prognoses that were -- had been proposed for Mr. Lobato?

        MR. STEPHENSON:  Object to form and foundation.

A.      Yeah.  I mean, I may have given opinions related to certain things that --

*again, that, "Well, you know, there is functional impairment. This seems maybe a bit excessive," or that sort of thing.*

*But there was not really anything in the -- in the sense of an absolute, like, "Oh, yeah, this is -- they shouldn't have any," or something like that. It was more a degree of what was asked for and what -- what my opinion of how much disability and impairment they would have related to it.*

Q.	*(By Mr. Newcomb) Well, do you -- do you remember that asking whether you felt that Mr. Lobato would have altered gait pattern over the long term?*

*MR. STEPHENSON: Object to form and foundation.*

A.	*I don't -- I don't recall specifically that.*

Q.	*(By Mr. Newcomb) Okay. All right.*

A.	*And this -- say -- this was Mr. Lobato --*

Q.	*Yes.*

A.	*-- we were speaking of?*

Q.	*Uh-huh.*

A.	*Okay. I would -- in general, with such an injury -- I don't recall specifically what I said to them. I would say, in general, that it's a possibility, and not an inevitability, with this particular type of fracture and arthritis that you would have altered gait pattern, that it's -- that's what I would, in a generic sense, say about that kind of injury…*

Q.	*(By Mr. Newcomb) All right. With respect to Clare Lobato, I'm going to ask you a series of questions, which you've probably heard many times in doing --*

A.	*Okay.*

Q.	*-- IME evaluations.*

A.	*Okay.*

Q.	*So we'll try to go through them --*

A.	*Okay.*

Q.	*-- I want to make --*

A.	*Sure.*

Q.	*--sure we have all of them.*

A.	*Sure.*

*Q. So in your opinion as an orthopedic surgeon, to a reasonable degree of medical certainty, what injuries or conditions of Clare's were caused by her motor vehicle accident?*

*MR. STEPHENSON: Object to form and foundation.*

*A. Okay. Well, her -- now, I'd have to -- I don't have the records in front of me, so side -- sides I may be, you know, inaccurate, but it -- there's one side with multiple metatarsal fractures, and then a Lisfranc injury on the opposite side with meta--with a first metatarsal fracture, and then there was ACL tear.*

*Q. (By Mr. Newcomb) Okay. In your opinion, what injuries or conditions claimed by Clare were caused by any event or occurrence before or after the collision?*

*MR. STEPHENSON: Object to form and foundation.*

*A. None to my knowledge, based on review of available records.*

*Q. (By Mr. Newcomb) Okay. Do you believe any of Clare's complaint -- complaints of injury are based on subjective versus objective evidence?*

*MR. STEPHENSON: Object to form and foundation.*

*A. I'm sorry. Repeat the question.*

*Q. (By Mr. Newcomb) Do you believe any of Clare's injuries or complaints of injury are based on subjective versus objective evidence?*

*MR. STEPHENSON: Object to form and foundation.*

*A. Meaning her injuries themselves or her …*

*Q. (By Mr. Newcomb) Her injuries themselves.*

*A. Okay. They're based on, yeah, objective findings.*

*Q. Okay.*

*A. Yes.*

*Q. They're all --*

*A. Yes.*

*Q. -- X-rays and --*

*A. X-rays --*

*Q. -- MRIs --*

*A. -- exactly, yes.*

Q.    -- diagnostic --

A.    Yes.

Q.    --right?

A.    Yes.

Q.    There's no question that those --

A.    Yes.

Q.    -- injuries --

A.    Existed and were -- yes.

Q.    -- were caused by the collision, right?

A.    Yes.

Q.    All right.   Do you have a current assessment of Clare's injuries or conditions?

   MR. STEPHENSON:  Object to form and foundation.

A.    Current assessment?

Q.    (By Mr. Newcomb)  Uh-huh.

A.    Meaning prognosis, or how --

Q.    Yes.

A.    Current assessment would be that my expectation with such injuries would -- would be that there would be some level of pain in the foot with a certain level of activities, and that varies from patient to patient with the same type of injury.

   But that some reasonable activities of daily living would be possible, doable with that, with more strenuous things leading to some level of limitation.

Q.    Is that the same with regard to her knee?

A.    Less impairment with regard -- most of the impairment in that constellations of injury, in my opinion, would be due to the foot and ankles -- foot injuries rather than to the knee injury.

Q.    Okay.   Do you believe that it was reasonable, based on your understanding of the -- of Clare's injuries, that she would have had temporary restrictions or inabilities to do certain activities after the collision?

   MR. STEPHENSON:  Object --

A.    Yes.

*MR. STEPHENSON: -- to form.*

*A.     Yes.*

*Q.     (By Mr. Newcomb)   Okay.   What's the reasonable time frame that you might expect, from a medical perspective, that Clare's injuries will resolve?*

*A.     Resolution, meaning no symptoms and no -- back to normal --*

*Q.     100 percent normal --*

*A.     -- function.*

*Q.     -- if that's your level.  Whatever resolution --*

*A.     Yeah.*

*Q.     -- do you believe is a reasonable time frame to expect that?*

*A.     Well, resolution will likely never be 100 percent with -- with the foot injuries at the -- for sure.  Some people have near-full recovery with an ACL, but with a -- the foot injuries, there's a very high likelihood of some residual level of symptoms.*

*Q.     Okay.  And that would, from your perspective at this point, be based on subjective reporting of -- of the patient?*

*MR. STEPHENSON:  Object to form and foundation.*

*A.     No.  I think just objectively with the type of injuries that were sustained.*

*Q.     (By Mr. Newcomb)   Okay.   Do you have a prognosis with respect to Clare's -- with Clare's feet, and if you need to break that into each one:  Right foot, do you have a prognosis?*

*MR. STEPHENSON:  Object to form.*

*A.     So typically with these injuries, you get some stiffness in the foot, which usually is well-tolerated.  You typically get arthritis that forms in the foot, that the side with the Lisfranc injury would probably be more than the side with the -- with just the metatarsal fractures.  That can lead to arthritis in the future.*

*That arthritis, in some percentage of the patients, requires surgery; some percentage of the patients requires nothing; some percentage, conservative measures, such as injections and orthotics and that sort of thing will manage the pain to where it's managed to a reasonable level.*

*Q.     (By Mr. Newcomb)  And this was with respect to the right foot.  Are all of those outcomes that you just mentioned reasonable to Ms. Lobato?*

*MR. STEPHENSON:  Object to form and foundation.*

*A.* All of those outcomes are possible with such an injury, yes.

*Q.* (By Mr. Newcomb) Okay.

*A.* One of -- any of those outcomes are possible with this injury.

*Q.* For Mrs. Lobato, though?

*A.* For Ms. Lobato in -- with regards to the Lisfranc injury, the crush injury with multiple metatarsal fractures.

*Q.* Okay. We've already talked about permanency, and I understand, I believe, that you have testified to that. In your opinion, have any --any of--again, from your examination of Clare or their medical records, have any habits or lifestyle choices contributed to Clare's symptoms or in any way hampered her recovery?

*MR. STEPHENSON: Object to form and foundation.*

*A.* Not that I recall from -- from any of the evaluations or records.

*Q.* (By Mr. Newcomb) Okay. And I know we've already talked about the midfoot fusion. I think you said it's -- that it's a possibility. Is it medically reasonable in her case?

*MR. STEPHENSON: Object to form and foundation.*

*A.* Medically reasonable that -- if she needed one in the future?

*Q.* (By Mr. Newcomb) Uh-huh.

*A.* Yes.

*Q.* Okay. With respect to Mr. Lobato -- and by the way, also let me ask you this:

Did you discuss or review any records for Mr. and Mrs. Lobato regarding their claims of having any anxiety or posttraumatic stress disorder from this collision?

*MR. STEPHENSON: Object to form and foundation.*

*A.* No, I -- I don't recall doing that, and I wouldn't

*Q.* (By Mr. Newcomb) Okay.

*A.* -- have any expertise on that.

*Q.* Okay. Thank you. With respect to Mr. Lobato, I'm going to just ask you the same series of questions --

*A.* Okay.

*Q.* *-- really. In your opinion as an orthopedic surgeon, to a reasonable degree of medical certainty, what injuries or conditions to Anthony were caused by the collision?*

*MR. STEPHENSON: Object to form and foundation.*

*A.* *I believe his main injury was a navicular fracture that was associated with -- with the crushing of his foot.*

*Q.* *(By Mr. Newcomb) Okay. And that was related to the collision?*

*A.* *Yes.*

*Q.* *All right. In your opinion, what injuries or conditions claimed by Anthony were caused by events or something either before or after the collision?*

*A.* *None that I recall from the review.*

*Q.* *All right. Again, with respect to Anthony, which complaints that he -- or, excuse me, which injuries -- let me ask it this way:*

*Do you believe his injuries from the collision are based on objective evidence?*

*A.* *Yes.*

*The Witness: Sorry.*

*Q.* *(By Mr. Newcomb) Do you have a current assessment of Anthony's injuries and conditions or injury to his -- to his foot?*

*MR. STEPHENSON: Object to form.*

*A.* *Okay. Just that, you know, you can say, Oh, he has a navicular fracture that was appropriately fixed, appropriately treated. He's at risk of posttraumatic arthritis in his talonavicular joint. Some of the time it's tolerated with conservative measures, and some of the time requires future fusion surgery.*

*Q.* *(By Mr. Newcomb) Do you have a -- what's a reasonable time frame that you might expect resolution of Anthony's foot injury?*

*A.* *There will be some degree of permanency in terms of stiffness and -- and possibly pain related to it.*

*Q.* *Okay. Again, is that also your prognosis for Anthony's injury? Is there any additional prognosis?*

*MR. STEPHENSON: Object to form and foundation.*

*A.* *Well, the main prognosis, so it's just -- there's permanent stiffness related to -- to such an injury. And pain is highly variable, pain and dysfunction is highly*

*variable from patient to patient --*

Q.    *(By Mr. Newcomb)  Sure.*

A.    *-- and the need for surgery is highly variable.*

Q.    *All right.  Are you aware of whether Anthony had any preexisting condition to his foot when you examined him?*

A.    *Not aware --*

      *MR. STEPHENSON:  Object to form and foundation.*

A.    *Not aware of any.*

Q.    *(By Mr. Newcomb)  Okay.  Have any of Anthony's habits or lifestyle choices contributed to his symptoms or hampered his recovery?*

      *MR. STEPHENSON:  Object to form and foundation.*

A.    *None that I saw from review of the records or speaking with him.*

Q.    *(By Mr. Newcomb)  Okay.  Do you recall that Mr. Lobato has been -- there's been a discussion about a possible foot fusion in the future for him related to his navicular fracture?*

A.    *Yes.*

Q.    *And is that medically reasonable?*

A.    *Yes.*

      *MR. STEPHENSON:  Object to form and foundation.*

A.    *Yes.*

Q.    *(By Mr. Newcomb)  Okay.  And finally, you don't have any -- you don't have any basis to opine that the -- any of his injuries was not related to the collision; is that right?*

A.    *No.*

Q.    *Okay.*

      *MR. NEWCOMB:  I think that's all the questions we have for you, sir.*

      **B.    LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:**  *See* deposition transcript dated September 21, 2018 (Lobato Expert 119-316). Dr. Nagamani holds the opinions stated herein within a reasonable degree of medical probability (meaning more probably than not), based upon his education, training, expertise and experience working as a paramedic and his experience in medical literature, medical knowledge and experience with injuries

such as those diagnosed in the Plaintiffs, and all materials and information used, consulted, or relied upon in formulating his opinions.

**C.    EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:**  *See* deposition transcript dated September 21, 2018 (Lobato Expert 119-316).   Plaintiffs intend to use all exhibits listed in the deposition as well.

**D.    THE QUALIFICATIONS OF THE WITNESS:** Dr. Nagamani is licensed to practice medicine in the State of Colorado and is a board-certified orthopedic surgeon.   He reviewed the Plaintiffs' medical records and examined Plaintiffs for injuries following the January 10, 2015 incident.

5.    Alex Beer, EMT
        Platte Valley Medical Center Ambulance

If called, Mr. Beer will provide expert testimony at trial related to the care and treatment of Plaintiffs.   He may also review additional documents and depositions, as they are made available during the discovery of this case, which may generate additional expert opinion testimony.   He will make himself available for deposition upon reasonable notice.   He may be called on direct, rebuttal or both. If called, he will testify consistent as to the Plaintiffs' medical history, the reasonableness and necessity of treatment, and other opinions relating thereto. In addition, he is expected to testify that the treatment provided to Plaintiffs was reasonable, necessary and related to the subject incident.   He is also expected to testify that the incurred charges for said treatment with Platte Valley Medical Center Ambulance were reasonable, usual and customary.   His testimony will be consistent with the opinions and observations expressed in his records and in his deposition, if taken, all of which are incorporated herein by reference.

**A.    STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:**  If called, he will testify to the treatment and care of Plaintiffs. He will testify that the following treatment and care rendered to the Plaintiffs is directly related to the January 10, 2015, incident.

THE PROVIDERS WILL TESTIFY TO ALL DATA PRESENT IN THEIR MEDICAL RECORDS AND BILLING PERTAINING TO PLAINTIFFS, INCLUDING BUT NOT LIMITED TO THE FOLLOWING:

*1/10/2015    Anthony*

*Pt is a 28 yro male who was the restrained driver of a pick up truck that was involved in a head-on MVA with another pickup traveling about 50mph.  Pt is c/o left ankle pain, he denies striking his head or any loss of consciousness.*

*1/10/2015    Clare*

*Pt is c/o bilateral foot pain, rated a 9/10. Pt also complaining of chest pain across the location of her seat belt…there is approximately 6 inches of passenger compartment intrusion, the dash is pushed forward and the patient's feet are trapped under the dash. Passenger side door is warped and inoperable. Extraction from PD was required and took approximately 10 minutes. Pt found trapped inside the vehicle.*

        **B.** **LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:** Mr. Beer holds the opinion stated herein within a reasonable degree of medical probability (meaning more probably than not), based upon his education, training, expertise and experience working as a paramedic and his experience in medical literature, medical knowledge and experience with injuries such as those diagnosed in the Plaintiffs, and all materials and information used, consulted, or relied upon in formulating his opinions.

        **C.** **EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:** He will use any or all of the following for demonstrative or opinion supporting purposes: diagnostic films, notes, accident diagram, witness statements, maps, diagrams, accident investigation materials, drawings, charts, posters, photographs, videos, animations, physical objects, multi-media presentations, anatomic models, medical payment log and/or Detailed Damages Summary with the Platte Valley Medical Center Ambulance bills.

        **D.** **THE QUALIFICATIONS OF THE WITNESS:** Mr. Beer is licensed to practice in the State of Colorado. He treated Plaintiffs for injuries following the January 10, 2015 incident.

      6.    Thomas G. Burke, MD
             Michael T. Preece, MD
             Catherine Gersman, PA-C
             Alton O. Parker, MD
             Kelly Knudson, MD
             William P. Cooney, MD
             Libby N. Taylor, OTR/L
             Kelli R. Koga, PT
             Julie A. Raine, MS, OTR/L
             Paul S. Hsieh, MD
             Andrew J. Fisher, MD
             Joseph Tan, MD
             Jeffrey A. Friedland, MD
             Gregg Koldenhoven, MD
             Linda S. Falb, MS, OTR/L
             Joseph L. Gayatao, PT
             Ryan Keller, DO

D. Kiley Mortensen, DO
Andrew Sonin, MD, FACR
Good Samaritan Medical Center

If called, the providers will provide expert testimony at trial related to the care and treatment of Plaintiffs. They may also review additional documents and depositions, as they are made available during the discovery of this case, which may generate additional expert opinion testimony. They will make themselves available for deposition upon reasonable notice. They may be called on direct, rebuttal or both. If called, they will testify consistent with Plaintiffs' medical history, the reasonableness and necessity of treatment, and other opinions relating thereto. In addition, they are expected to testify that the treatment provided to Plaintiffs was reasonable, necessary and related to the subject incident. They are also expected to testify that the incurred charges for said treatment with Good Samaritan Medical Center were reasonable, usual and customary. Their testimony will be consistent with the opinions and observations expressed in their records and in their deposition, if taken, all of which are incorporated herein by reference.

**A.    STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:** If called, they will testify to the treatment and care of Plaintiffs. They will testify that the following treatment and care rendered to the Plaintiffs is directly related to the January 10, 2015, incident.

THE PROVIDERS WILL TESTIFY TO ALL DATA PRESENT IN THEIR MEDICAL RECORDS AND BILLING PERTAINING TO PLAINTIFFS, INCLUDING BUT NOT LIMITED TO THE FOLLOWING:

*1/10/2015     Anthony*

<u>*Chief Complaint*</u>

*Ankle pain*
*Motor Vehicle Crash*

*The patient complains of medial left ankle and foot pain.*

*Left ankle radiographs*

*Impression:*

*1.     Subtle mineralization along the talonavicular joint which could represent an age indeterminant capsular avulsion injury. Evaluate for point tenderness in this region.*
*2.     Otherwise, normal radiographs of the left ankle.*

*Final Impression:*

1. *Motor vehicle accident*
2. *Ankle sprain*
3. *Contusion of leg.*

*1/10/2015    Clare*

*Chief complaint:*
*Motor Vehicle Crash*
*Foot Pain*

*Clare M. Fassio is a 29yr female who presents via EMS after motor vehicle accident. Patient was a restrained front seat passenger. Her vehicle was struck head on by another car traveling approximately 50 mph. Airbags did deploy. There was moderate intrusion to her vehicle. Patient's feet were pinned by the dashboard, and EMS need to extricate the patient. Extrication time was estimated at 10 minutes. Pain is rated as an 8/10, worse with movement and palpitation of her foot.*

*Final Impression:*
1. *MVA (motor vehicle accident)*
2. *Multiple closed fractures of metatarsal bone of left foot*
3. *Left cuboid fracture*
4. *Fracture of 1st metatarsal*

*Discharge Summary*

*1/13/15*

*Primary Diagnosis: Fracture of metatarsal bone of left foot*

*Xrays on arrival to ER showed fractures of BL feet including multiple metatarsals and cuboid fractures BL. She was admitted for pain control. No other acute injuries except anterior chest contusion without fracture. She was seen by orthopedics. Determined to need surgical fixation of one or both feet but would be delayed to allow decreased swelling. She is strict NWB on LLE and has a walking boot on RLE for heel touch down for transfers only. She has worked with physical therapy on transfer training and is doing with using a slide board. Followup with orthopedics tomorrow for surgical planning.*

**B.    LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:** The providers hold the opinion stated herein within a reasonable degree of medical probability (meaning more probably than not), based upon their education, training, expertise and experience working in the hospital and their experience in medical literature, medical knowledge and

experience with injuries such as those diagnosed in the Plaintiffs, and all materials and information used, consulted, or relied upon in formulating their opinions.

**C.    EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:**  They will use any or all of the following for demonstrative or opinion supporting purposes:  diagnostic films, notes, accident diagram, witness statements, maps, diagrams, accident investigation materials, drawings, charts, posters, photographs, videos, animations, physical objects, multi-media presentations, anatomic models, medical payment log and/or Detailed Damages Summary with the Good Samaritan Medical Center bills.

**D.    THE QUALIFICATIONS OF THE WITNESS:**  The providers are licensed to practice in the State of Colorado.  They treated Plaintiffs for injuries following the January 10, 2015 incident.

> 7.    Gregg A. Koldenhoven, MD
> Sachin K. Talusani, M.D.
> William P. Cooney, M.D.
> Front Range Orthopedics & Spine

If called, the providers will provide expert testimony at trial related to the care and treatment of Plaintiffs.  They may also review additional documents and depositions, as they are made available during the discovery of this case, which may generate additional expert opinion testimony.  They will make themselves available for deposition upon reasonable notice.  They may be called on direct, rebuttal or both.  If called, they will testify consistent with Plaintiffs' medical history, the reasonableness and necessity of treatment, and other opinions relating thereto.  In addition, they are expected to testify that the treatment provided to Plaintiffs was reasonable, necessary and related to the subject incident.  They are also expected to testify that the incurred charges for said treatment with Front Range Orthopedics & Spine were reasonable, usual and customary.  Their testimony will be consistent with the opinions and observations expressed in their records all of which are incorporated herein by reference.  Dr. Koldenhoven's testimony will be consistent with the opinions and observations expressed in his deposition taken on October 4, 2018.

**A.    STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:**  If called, they will testify to the treatment and care of Plaintiffs.  They will testify the incident caused bodily injury and permanent impairment to the Plaintiffs, and that these impairments are a direct and proximate cause of the incident.  They will testify that the following treatment and care rendered to the Plaintiffs is directly related to the January 10, 2015, incident.

THE PROVIDERS WILL TESTIFY TO ALL DATA PRESENT IN THEIR MEDICAL RECORDS AND BILLING PERTAINING TO PLAINTIFFS, INCLUDING BUT NOT LIMITED TO THE FOLLOWING:

*1/14/2015     Anthony*

*<u>Procedures</u>*
*MRI jnt of lwr extre w/o contrast*
*Assessment & Plan*
*Tear of deltoid ligament of ankle*
*Problem Story:  left*
*<u>Current Plans:</u>*
*MRI jnt of lwr extre w/o contrast*
*Follow up for MRI results*

*1/21/2015*

*Current Plans:*

*CT lower extremity w/o dye*
*Follow up to review results*

*1/29/15*

*Current Plans:*

*Surgery to be scheduled.  Left foot navicular open reduction and internal fixation.*

*2/3/15*

*Date of Operation:  February 3, 2015*

*Preoperative Diagnosis:  Left navicular fracture*
*Procedure:  Open reduction and internal fixation left navicular fracture*

*9/3/15*

*Radiology Report:  Left ankle MRI, without contrast*

*Impression:*
*1)     Intact ligaments.  Specifically, the anterior talofibular ligament appears normal.*
*2)     No evidence for tendon injury.*
*3)     Hardware artifact in the region of the navicular.*

*9/10/15*

*Note: Today I personally reviewed the MRI scan with the patient. I think he has some degree of sinus Tarsi syndrome. Presently, I think it would be reasonable to consider a sinus tarsi injection and lateral ankle rehabilitation program. Under sterile conditions the sinus tarsi was injected.*

*Patient is given a script for physical therapy.*

*10/6/2016*

*Evaluation of left foot. Foot is still causing him pain after a left navicular open reduction and internal fixation on 2/3/2015 by Dr. Koldenhoven.*

*Assessment & Plan:*
*Post-traumatic arthritis of left ankle*
*Story: talonavicular*

*Note: Anthony is been having midfoot pain in the area of the previous navicular ORIF. He has posttraumatic arthritis of the talonavicular joint which is moderate. Currently, I think we can try some conservative measures. We will get him some custom orthotics to help support that joint as well as consider Mobic for a short course. Hopefully, that'll alleviate his symptoms. He is very likely going to need further intervention moving forward in the forms of injections and likely surgical management at some point for talonavicular fusion based on the amount of arthritis he has. Certainly we will put that off as long as possible but I think at his age and activity level, that joint is going to wear over time and likely cause chronic problems.*

*1/14/15        Clare*

*Problem List*
*Lisfranc's dislocation-left*
*Closed fracture of metatarsal neck – R 2nd, 3rd, 4th & L 1st*

*Current Plans*
*Surgery to be scheduled. R foot 2,3,4 metatarsal neck fracture open reduction perc pinning, L foot open reduction and internal fixation 1st metatarsal base fracture and Lisfranc joint fixation.*

*2/4/15 Post Operative follow-up*

*Plans: X-ray exam of left foot, x-ray exam of right foot, sutures removed, apply short leg cast, follow up in 2 weeks.*

*3/2/15 - Pins pulled out of foot.*

*5/13/15   Presently recommend consideration of removal of the Lisfrac screw.*

*Discussed the fact that she is likely going to need further operative intervention with regards to the TMT joints on the right foot. We will stress the foot under C-arm at the time of hardware removal. Surgery to be scheduled. Right foot hardware removal, syndesmotic screw.*

*7/10/15*
*Preoperative Diagnosis: State post right Lisfranc dislocation with retained hardware*
*Procedure: Removal Lisfranc fixation screw right foot*

*8/13/15 Evaluation of left knee pain*
*Assessment: ACL tear*
*Plan: X-ray exam of left knee*
*MRI knee w/o contrast*

*8/31/15 Evaluation*
*Assessment & Plan*
*Left ACL tear*
*Current Plans*
*Recommend referral for ACL surgical management and other advice for nonsurgical management to one of the sports medicine specialists.*

*9/6/15 Surgery to be scheduled. Left knee ACL reconstruction*

*9/30/15*
*Preoperative Diagnosis: Left knee anterior cruciate ligament disruption*
*Procedure: Left knee ACL reconstruction*

*10/8/15 Given knee immobilizer*

*10/19/15 Sutures removed, staples removed – started physical therapy last week.*

*12/7/15*
*Assessment & Plan*
*Displaced fracture of cuboid bone of right foot, subsequent encounter for fracture with routine healing*
*X-ray exam of right foot*
*Painful orthopedic hardware*

*Will call for surgery scheduled. Right foot hardware removal.*

*3/28/16*
*Assessment & Plan*
*Fracture of unspecified metatarsal bone(s), unspecified foot, subsequent encounter for fracture with routine healing*
*Story: R2nd, 3rd, 4th & L 1st*

*Displaced fracture of cuboid bone of right foot, subsequent encounter for fracture with routine healing*
*Painful orthopaedic hardware, subsequent encounter*

*Surgery to be scheduled.  Right foot hardware removal*

*4/15/16*
*Preoperative Diagnosis:  Right foot retained hardware*
*Procedure:  Removal right foot retained hardware*

*8/22/16*

*Clare returns to the office today for a follow up on her right foot hardware removal performed 4/15/16 by Dr. Koldenhoven.  She states that her symptoms are improving.*

*Assessment & Plan:*
*Painful orthopaedic hardware, subsequent hardware*

*Note:  Ms. Fassio is doing well.  Overall is somewhat limited by her injuries from before.  I think that she is likely going to need further intervention down the line but difficult to predict.  This may include midfoot fusion.  Could also include hardware removal of the foot.  For now, she can be activity as tolerated.  Follow-up as needed for now.  Discussed with patient that this is not likely the end of the need for medical care for the feet but she is doing okay and will follow-up if she is not happy with her full progress.  She does state that the feet swell quite a bit more than ….she's on him for any small period of time.  They do also ache frequently.*

**B.    LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:**  The providers hold the opinion stated herein within a reasonable degree of medical probability (meaning more probably than not), based upon their education, training, expertise and experience working in a medical facility and their experience in medical literature, medical knowledge and experience with injuries such as those diagnosed in the Plaintiffs, and all materials and information used, consulted, or relied upon in formulating their opinions.

**C.    EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:**  They will use any or all of the following for demonstrative or opinion supporting purposes: diagnostic films, notes, accident diagram, witness statements, maps, diagrams, accident investigation materials, drawings, charts, posters, photographs, videos, animations, physical objects, multi-media presentations, anatomic models, medical payment log and/or Detailed Damages Summary with the Front Range Orthopedics & Spine bills and the transcript from Dr. Koldenhoven's deposition taken on October 4, 2018.

**D.    THE QUALIFICATIONS OF THE WITNESS:**  The providers are licensed to practice in the State of Colorado.  They treated Plaintiffs for injuries following the January 10, 2015 incident.

8.    Gregg A. Koldenhoven, MD
William P. Cooney, MD
Front Range Orthopedic Surgery Center

If called, the providers will provide expert testimony at trial related to the care and treatment of Plaintiffs.  They may also review additional documents and depositions, as they are made available during the discovery of this case, which may generate additional expert opinion testimony.  They will make themselves available for deposition upon reasonable notice.  They may be called on direct, rebuttal or both.  If called, they will testify consistent with Plaintiffs' medical history, the reasonableness and necessity of treatment, and other opinions relating thereto.  In addition, they are expected to testify that the treatment provided to Plaintiffs was reasonable, necessary and related to the subject incident.  They are also expected to testify that the incurred charges for said treatment with Front Range Orthopedic Surgery Center were reasonable, usual and customary.  Their testimony will be consistent with the opinions and observations expressed in their records all of which are incorporated herein by reference.  Dr. Koldenhoven's testimony will be consistent with the opinions and observations expressed in his deposition taken on October 4, 2018.

**A.    STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:**  If called, they will testify to the treatment and care of Plaintiffs. They will testify the incident caused bodily injury and permanent impairment to the Plaintiffs, and that these impairments are a direct and proximate cause of the incident.  They will testify that the following treatment and care rendered to the Plaintiffs is directly related to the January 10, 2015, incident.

THE PROVIDERS WILL TESTIFY TO ALL DATA PRESENT IN THEIR MEDICAL RECORDS AND BILLING PERTAINING TO PLAINTIFFS, INCLUDING BUT NOT LIMITED TO THE FOLLOWING:

*2/3/15        Anthony*

*Date of Operation:  February 3, 2015*

*Preoperative Diagnosis:  Left navicular fracture*
*Procedure:  Open reduction and internal fixation left navicular fracture*

*7/10/2015      Clare*

*Preoperative Diagnosis:  Status post right Lisfranc fracture dislocation with retained hardware*

*Procedure:  Removal Lisfranc fixation screw right foot*

*9/30/15*

*Preoperative Diagnosis:  Left knee anterior cruciate ligament disruption*
*Procedure:  Left knee ACL reconstruction*

*4/15/16*

*Preoperative Diagnosis:  Right foot retained hardware*
*Procedure:  Removal right foot retained hardware*

**B.     LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:**  The providers hold the opinion stated herein within a reasonable degree of medical probability (meaning more probably than not), based upon their education, training, expertise and experience working in a medical facility and their experience in medical literature, medical knowledge and experience with injuries such as those diagnosed in the Plaintiffs, and all materials and information used, consulted, or relied upon in formulating their opinions.

**C.     EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:**  They will use any or all of the following for demonstrative or opinion supporting purposes: diagnostic films, notes, accident diagram, witness statements, maps, diagrams, accident investigation materials, drawings, charts, posters, photographs, videos, animations, physical objects, multi-media presentations, anatomic models, medical payment log and/or Detailed Damages Summary with the Front Range Orthopedic Surgery Center bills and the transcript from Dr. Koldenhoven's deposition taken on October 4, 2018.

**D.     THE QUALIFICATIONS OF THE WITNESS:**  The providers are licensed to practice in the State of Colorado.  They treated Plaintiffs for injuries following the January 10, 2015 incident.

    9.     Melissa Henston, PsyD
           Colorado NeuroBehavioral Health, PC

        If called, Dr. Melissa Henston will provide expert testimony at trial related to the care and treatment of Plaintiffs.  She may also review additional documents and depositions, as she is made available during the discovery of this case, which may generate additional expert opinion testimony.  She will make herself available for deposition upon reasonable notice.  She may be called on direct, rebuttal or both.  If called, she will testify consistent with Plaintiffs' medical history, the reasonableness and necessity of treatment, and other opinions relating thereto.  In addition, she is expected to testify that the treatment provided to Plaintiffs was reasonable, necessary and related to the subject incident.  She

is also expected to testify that the incurred charges for said treatment with Colorado NeuroBehavioral Health, PC were reasonable, usual and customary. Her testimony will be consistent with the opinions and observations expressed in her records and in her deposition, if taken, all of which are incorporated herein by reference.

**A.    STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:**  If called, she will testify to the treatment and care of Plaintiffs. They will testify the incident caused bodily injury and psychological impairment to the Plaintiffs, and that these impairments are a direct and proximate cause of the incident.  They will testify that the following treatment and care rendered to the Plaintiffs is directly related to the January 10, 2015, incident.

THE PROVIDER WILL TESTIFY TO ALL DATA PRESENT IN HER MEDICAL RECORDS AND BILLING PERTAINING TO PLAINTIFFS, INCLUDING BUT NOT LIMITED TO THE FOLLOWING:

*8/23/15        Anthony*

*Diagnosis:  Posttraumatic Stress Disorder, mild, as likely as not developed for Mr. Lobato during the head-on collision which took place on January 10, 2015.*

*Recommendations:   Participation in six sessions of brief therapy to address symptoms of posttraumatic stress disorder.*

*10/9/15*

*Target Problem: Mr. Lobato is a 29-year old engaged white male. He was involved in a head on collision on January 10, 2015. He presents with aspects of Post-Traumatic Stress disorder. He also continues to present with aspects of chronic pain.*

*Patient Progress:    Mr. Lobato has worked very hard to understand how posttraumatic stress disorder can impact him.  He understands that stressors in his environment, even if they are unrelated to the accident, can cause him to feel symptoms associated with PTSD.  Ms. Lobato reflected that he feels that he has done some of the same exposure work that his fiancé, Ms. Fassio, has done, such as driving by the accident scene.  He reflected that he has processed the accident many times and understands that not having control over what was going on was the primary stressor for him along with his great concern and sense of responsibility that he felt for Ms. Fassio.  He also discussed the chronic pain issues and how they may impact him for a considerable period of time, perhaps for the rest of his life. He noted his frustration but also stated that he is working towards a sense of acceptance.*

*Homework Assigned:  Continue to work toward acceptance.  Work on coping skills in order to relax when overstimulated by stressors.*

*Plan for next session:  Sessions are completed.*

*8/23/15          Clare*

*Diagnosis:  Posttraumatic Stress Disorder, mild, as likely as not developed for Mr. Lobato during the head-on collision which took place on January 10, 2015.*

*Recommendations:   Participation in six sessions of brief therapy to address symptoms of posttraumatic stress disorder.*

*10/13/15*

*Target Problem: Ms. Fassio is a 30-year old engaged white female. She was involved in a head on collision on January 10, 2015. She presents with aspects of Post-Traumatic Stress disorder. She also continues to present with aspects of chronic pain.*

*Patient Progress:  Ms. Fassio has made progress managing her PTSD symptoms through both mindfulness and her own form of exposure therapy.  She has also worked on acceptance of the physical health issues that she has faced due to the accident.  She acknowledged that the PTSD continues to cause her anxiety, and she acknowledged that her physical health issues which may be ongoing for the remainder of her life cause her a sense of frustration and depression at times.  Ms. Fassio expressed that focusing on the negatives would never work for her and she will work towards acceptance, tolerance and knowledge around her issues.*

*Homework assigned:   Continue to focus on mindfulness, acceptance, and relaxation skills.*

*Plan for next session:  Sessions are considered complete.*

**B.    LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:**  Dr. Henston holds the opinion stated herein within a reasonable degree of medical probability (meaning more probably than not), based upon her education, training, expertise and experience as a psychologist working in the medical field and her experience in medical literature, medical knowledge and experience with injuries such as those diagnosed in the Plaintiffs, and all materials and information used, consulted, or relied upon in formulating her opinions.

**C.    EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:**  She will use any or all of the following for demonstrative or opinion supporting purposes:  diagnostic films, notes, accident diagram, witness

statements, maps, diagrams, accident investigation materials, drawings, charts, posters, photographs, videos, animations, physical objects, multi-media presentations, anatomic models, medical payment log and/or Detailed Damages Summary with the Colorado NeuroBehavioral Health, P.C. bills.

**D.** **THE QUALIFICATIONS OF THE WITNESS:** Dr. Henston is licensed a psychologist licensed to practice in the State of Colorado. She treated Plaintiffs for injuries following the January 10, 2015 incident.

10. Virginia Scroggins, MD
Touchstone Imaging Thornton

If called, Dr. Scroggins will provide expert testimony at trial related to the care and treatment of Plaintiff Anthony Lobato. She may also review additional documents and depositions, as she is made available during the discovery of this case, which may generate additional expert opinion testimony. She will make herself available for deposition upon reasonable notice. She may be called on direct, rebuttal or both. If called, she will testify consistent with Plaintiff Anthony Lobato's medical history, the reasonableness and necessity of treatment, and other opinions relating thereto. In addition, she is expected to testify that the treatment provided to Plaintiff Anthony Lobato was reasonable, necessary and related to the subject incident. She is also expected to testify that the incurred charges for said treatment with Touchstone Imaging Thornton were reasonable, usual and customary. Her testimony will be consistent with the opinions and observations expressed in her records and in her deposition, if taken, all of which are incorporated herein by reference.

**A.** **STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:** If called, she will testify to the treatment and care of Plaintiff Anthony Lobato. She will testify that the following treatment and care rendered to the Plaintiff is directly related to the January 10, 2015, incident.

THE PROVIDERS WILL TESTIFY TO ALL DATA PRESENT IN THEIR MEDICAL RECORDS AND BILLING PERTAINING TO PLAINTIFFS, INCLUDING BUT NOT LIMITED TO THE FOLLOWING:

*1/17/2015*

*Technique: Axial PD, T2 fat sat; coronal PD with fat-sat; sagittal T1, STIR*

*Impression:*

1. *Sagittally oriented, possibly comminuted fracture of the navicular.*
2. *Intact deltoid ligament.*
3. *Mild bone contusions of the cuneiforms.*

**B.    LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:**  Dr. Scroggins holds the opinion stated herein within a reasonable degree of medical probability (meaning more probably than not), based upon her education, training, expertise and physical therapy experience and experience working in the medical field and her experience in radiology, medical literature, medical knowledge and experience with injuries such as those diagnosed in Plaintiff Anthony Lobato, and all materials and information used, consulted, or relied upon in formulating her opinions.

**C.    EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:**  She will use any or all of the following for demonstrative or opinion supporting purposes:  diagnostic films, notes, accident diagram, witness statements, maps, diagrams, accident investigation materials, drawings, charts, posters, photographs, videos, animations, physical objects, multi-media presentations, anatomic models, medical payment log and/or Detailed Damages Summary with the Touchstone Imaging Thornton bills.

**D.    THE QUALIFICATIONS OF THE WITNESS:**  Dr. Scroggins has a specialty in radiology and is licensed to practice in the State of Colorado. She treated Plaintiff Anthony Lobato for injuries following the January 10, 2015 incident.

11.    Joseph Tan, MD
Jeffrey Friedland, MD
Andrew J. Fisher, MD
Paul Hsieh, MD
Radiology Imaging Associates

If called, the providers will provide expert testimony at trial related to the care and treatment of Plaintiff Clare Lobato.  They may also review additional documents and depositions, as they are made available during the discovery of this case, which may generate additional expert opinion testimony.  They will make themselves available for deposition upon reasonable notice.  They may be called on direct, rebuttal or both.  If called, they will testify consistent with Plaintiff Clare Lobato's medical history, the reasonableness and necessity of treatment, and other opinions relating thereto.  In addition, they are expected to testify that the treatment provided to Plaintiff Clare Lobato was reasonable, necessary and related to the subject incident.  They are also expected to testify that the incurred charges for said treatment with Radiology Imaging Associates were reasonable, usual and customary.  Their testimony will be consistent with the opinions and observations expressed in their records and in their deposition, if taken, all of which are incorporated herein by reference.

**A.    STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:**  If called, they will testify to the treatment and care of Plaintiff

Clare Lobato. They will testify that the following treatment and care rendered to the Plaintiff is directly related to the January 10, 2015, incident.

THE PROVIDERS WILL TESTIFY TO ALL DATA PRESENT IN THEIR MEDICAL RECORDS AND BILLING PERTAINING TO PLAINTIFFS, INCLUDING BUT NOT LIMITED TO THE FOLLOWING:

*Right foot radiographs*

*Indication:  Pain after motor vehicle accident*
*Impression:*
*1.      Comminuted displaced fracture of the base of the 1st metatarsal with intra-articular extent.*
*2.      Linear lucency along the base of the 2nd metatarsal may represent artifact versus a nondisplaced fracture.*

*Left foot radiographs*

*Indication:  Pain after motor vehicle accident*
*Impression:   Multiple fractures of the metatarsals and tarsal bones as described above.*

*Sternum Radiographs – 2 views*

*Indication:  Pain*
*Impression:  Unremarkable sternum radiographs*

*1/12/15*

*CT of the lower extremity without contrast*

*Indication:  Trauma to the right foot and to the left foot*
*Impression:*
*1.      Right-sided fractures include distal cuboid, as well as proximal first through fifth metatarsal bones.*
*2.      Left-sided fractures include anterior process of calcaneus, navicular, cuboid, lateral cuneiform, proximal fourth and fifth metatarsal bones, distal second through fifth metatarsal bones*

        **B.      LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:**  The providers hold the opinion stated herein within a reasonable degree of medical probability (meaning more probably than not), based upon their education, training, expertise and experience working as paramedics and their experience in medical literature, medical knowledge and experience with injuries such as those diagnosed in the Plaintiff Clare Lobato,

and all materials and information used, consulted, or relied upon in formulating their opinions.

**C.      EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:**  They will use any or all of the following for demonstrative or opinion supporting purposes:      diagnostic films, notes, accident diagram, witness statements, maps, diagrams, accident investigation materials, drawings, charts, posters, photographs, videos, animations, physical objects, multi-media presentations, anatomic models, medical payment log and/or Detailed Damages Summary with the Radiology Imaging Associates bills.

**D.      THE QUALIFICATIONS OF THE WITNESS:**  The providers are licensed to practice in the State of Colorado.  They treated Plaintiff Clare Lobato for injuries following the January 10, 2015 incident.

12.      Horacio Gutierrez, MD
          Twin Peaks Medical Imaging

If called, Dr. Gutierrez will provide expert testimony at trial related to the care and treatment of Plaintiff Anthony Lobato.   He may also review additional documents and depositions, as he is made available during the discovery of this case, which may generate additional expert opinion testimony.   He will make himself available for deposition upon reasonable notice.   He may be called on direct, rebuttal or both.   If called, he will testify consistent with Plaintiff Anthony Lobato's medical history, the reasonableness and necessity of treatment, and other opinions relating thereto.   In addition, he is expected to testify that the treatment provided to Plaintiff Anthony Lobato was reasonable, necessary and related to the subject incident.   He is also expected to testify that the incurred charges for said treatment with Twin Peaks Medical Imaging were reasonable, usual and customary.   His testimony will be consistent with the opinions and observations expressed in his records and in his deposition, if taken, all of which are incorporated herein by reference.

**A.      STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:**  If called, they will testify to the treatment and care of Plaintiff Anthony Lobato. They will testify that the following treatment and care rendered to the Plaintiff is directly related to the January 10, 2015, incident.

THE PROVIDERS WILL TESTIFY TO ALL DATA PRESENT IN THEIR MEDICAL RECORDS AND BILLING PERTAINING TO PLAINTIFFS, INCLUDING BUT NOT LIMITED TO THE FOLLOWING:

*1/23/15*

*Technique:  Noncontrast axial sections with multiplanar 2D and 3D reconstruction imaging was obtained through the left foot.*

*Impression:  Acute comminuted navicular fracture.*

**B.    LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:**  Dr. Gutierrez holds the opinion stated herein within a reasonable degree of medical probability (meaning more probably than not), based upon his education, training, expertise and physical therapy experience and experience working in the medical field and his experience in radiology, medical literature, medical knowledge and experience with injuries such as those diagnosed in Plaintiff Anthony Lobato, and all materials and information used, consulted, or relied upon in formulating his opinions.

**C.    EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:**  He will use any or all of the following for demonstrative or opinion supporting purposes:  diagnostic films, notes, accident diagram, witness statements, maps, diagrams, accident investigation materials, drawings, charts, posters, photographs, videos, animations, physical objects, multi-media presentations, anatomic models, medical payment log and/or Detailed Damages Summary with the Twin Peaks Medical Imaging bills.

**D.    THE QUALIFICATIONS OF THE WITNESS:**  Dr. Gutierrez has a specialty in radiology and is licensed to practice in the State of Colorado.  He treated Plaintiff Anthony Lobato for injuries following the January 10, 2015 incident.

13.    Zachary Chandler, PT
        ATI Physical Therapy

If called, Zachary Chandler will provide expert testimony at trial related to the care and treatment of Plaintiff Anthony Lobato.  He may also review additional documents and depositions, as he is made available during the discovery of this case, which may generate additional expert opinion testimony.  He will make himself available for deposition upon reasonable notice.  He may be called on direct, rebuttal or both.  If called, he will testify consistent with Plaintiff Anthony Lobato's medical history, the reasonableness and necessity of treatment, and other opinions relating thereto.  In addition, he is expected to testify that the treatment provided to Plaintiff Anthony Lobato was reasonable, necessary and related to the subject incident.  He is also expected to testify that the incurred charges for said treatment with ATI Physical Therapy were reasonable, usual and customary.  His testimony will be consistent with the opinions and observations expressed in his records and in his deposition, if taken, all of which are incorporated herein by reference.

**A.    STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:**  If called, he will testify to the treatment and care of Plaintiff Anthony Lobato. He will testify that the following treatment and care rendered to the Plaintiff is directly related to the January 10, 2015, incident.

THE PROVIDERS WILL TESTIFY TO ALL DATA PRESENT IN THEIR MEDICAL RECORDS AND BILLING PERTAINING TO PLAINTIFFS, INCLUDING BUT NOT LIMITED TO THE FOLLOWING:

*9/15/2015*

*Primary/Rehab Diagnosis: Abnormal gait, fracture: navicular, instability: ankle, ORIF: ankle, Pain: foot/ankle*

*Primary complaint: left ankle pain & dysfunction*

*Plan of Treatment: 2x a week for 8 weeks*

*12/23/15*

*Anthony reports he is doing well today. He attempted interval jogging with minimal issue.*

*Assessment: Pt with minimal dysfunction at this time. Independent with HEP.*

*Plan: Discharge. D/C to HEP.*

      **B.    LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:** Zachary Chandler holds the opinion stated herein within a reasonable degree of medical probability (meaning more probably than not), based upon his education, training, expertise and physical therapy experience and experience working in the medical field and his experience in physical therapy, medical literature, medical knowledge and experience with injuries such as those diagnosed in Plaintiff Anthony Lobato, and all materials and information used, consulted, or relied upon in formulating his opinions.

      **C.    EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:** He will use any or all of the following for demonstrative or opinion supporting purposes: diagnostic films, notes, accident diagram, witness statements, maps, diagrams, accident investigation materials, drawings, charts, posters, photographs, videos, animations, physical objects, multi-media presentations, anatomic models, medical payment log and/or Detailed Damages Summary with the ATI Physical Therapy bills.

      **D.    THE QUALIFICATIONS OF THE WITNESS:** Zachary Chandler has a specialty in physical therapy and is licensed to practice in the State of Colorado. He treated Plaintiff Anthony Lobato for injuries following the January 10, 2015 incident.

    14.    Lara Canham, PT, DPT

Lauren A. Binder, PT, DPT, OCS
Justin Dudley, PT, DPT, SCS, EMT
Cascade Sports Injury Prevention & Physical Therapy LLC

If called, the providers will provide expert testimony at trial related to the care and treatment of Plaintiff Clare Lobato. They may also review additional documents and depositions, as they are made available during the discovery of this case, which may generate additional expert opinion testimony. They will make themselves available for deposition upon reasonable notice. They may be called on direct, rebuttal or both. If called, they will testify consistent with Plaintiff Clare Lobato's medical history, the reasonableness and necessity of treatment, and other opinions relating thereto. In addition, they are expected to testify that the treatment provided to Plaintiff Clare Lobato was reasonable, necessary and related to the subject incident. They are also expected to testify that the incurred charges for said treatment with Cascade Sports Injury Prevention & Physical Therapy LLC were reasonable, usual and customary. Their testimony will be consistent with the opinions and observations expressed in their records and in their deposition, if taken, all of which are incorporated herein by reference.

**A. STATEMENT OF OPINIONS TO BE EXPRESSED AND THE BASIS THEREOF:** If called, they will testify to the treatment and care of Plaintiff Clare Lobato. They will testify that the following treatment and care rendered to the Plaintiff is directly related to the January 10, 2015, incident.

THE PROVIDERS WILL TESTIFY TO ALL DATA PRESENT IN THEIR MEDICAL RECORDS AND BILLING PERTAINING TO PLAINTIFFS, INCLUDING BUT NOT LIMITED TO THE FOLLOWING:

*10/6/2015*

*Diagnosis: Pain in left knee, sprain of anterior cruciate ligament of left knee*

*Primary Concern/Chief Complaint: L ACL reconstruction but also residual impairments from her B foot fxs/surgeries.*

*Frequency: 1-2 times a week*
*Duration: 30 weeks*

*Her prognosis is decreased with her hx of MVA and B ankle/foot fractures with associated surgeries. It will be imperative that we treat the feet/ankles as we progress her forward with her ACL rehabilitation, otherwise we will not be able to meet the milestones associated with ACL rehabilitation.*

*11/13/15 My foot is about the same, I went and bought orthotics and they help a little. It's still in the same place. The knee is feeling good.*

*7/11/2016  Patient self discharged and plans to continue independently.*

**B.    LIST OF DATA OR INFORMATION CONSIDERED IN FORMING OPINIONS:**  The providers hold the opinion stated herein within a reasonable degree of medical probability (meaning more probably than not), based upon their education, training, expertise and experience working as physical therapists and their experience in medical literature, medical knowledge and experience with injuries such as those diagnosed in the Plaintiff Clare Lobato, and all materials and information used, consulted, or relied upon in formulating their opinions.

**C.    EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR THE OPINIONS:**  They will use any or all of the following for demonstrative or opinion supporting purposes:  diagnostic films, notes, accident diagram, witness statements, maps, diagrams, accident investigation materials, drawings, charts, posters, photographs, videos, animations, physical objects, multi-media presentations, anatomic models, medical payment log and/or Detailed Damages Summary with the Cascade Sports Injury Prevention & Physical Therapy LLC bills.

**D.    THE QUALIFICATIONS OF THE WITNESS:**  The providers are licensed to practice in the State of Colorado.  They treated Plaintiff Clare Lobato for injuries following the January 10, 2015 incident.

**E.    <u>CERTIFICATION</u>**

I hereby certify that the above information is true, correct and complete to the best of my knowledge and belief as of the date set forth below.

Respectfully submitted this 16th day of November, 2018.

*/s/ Andrew M. Newcomb*
**Andrew M. Newcomb**
**Jennifer A. Milne**
Speights & Worrich, LLC
2149 South Holly Street, Suite 105
Denver, CO 80222
Telephone: (303) 662-8082
Facsimile:  (303) 662-8083
Email: andrew@speightsfirm.com
jennifer@speightsfirm.com
Attorneys for Plaintiffs Anthony B. Lobato and Clare M. Lobato

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 16th day of November, 2018,

a true and correct copy of the foregoing **PLAINTIFFS' EXPERT WITNESS**

**DISCLOSURES** was served on the following, by email:

Wheeler Trigg O'Donnell LLP
Evan B. Stephenson
Carrie M. Hobbs
370 Seventeenth Street, Suite 4500
Denver, CO  80202
Telephone: (303) 244-1800
Email: stephenson@wtotrial.com
         hobbs@wtotrial.com

Attorneys for Defendant, Travelers Property Casualty Company of America


*/s/  Katie Lacey*
Paralegal